IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI‘I

| | |
|---|---|
| DENISE KALFF,<br><br>Petitioner,<br><br>vs.<br><br>SAMUEL QUINTON HO‘IKAIKA FENNELL,<br><br>Respondent. | Civil No. 26-00112 MWJS-KJM<br><br><br>ORDER DENYING VERIFIED PETITION FOR RETURN OF CHILD TO GERMANY |

## **INTRODUCTION**

This is a challenging case arising under The Hague Convention on the Civil Aspects of International Child Abduction (the "Convention") and its implementing legislation.  The challenge comes not merely from the Convention's admonition that a court must resolve the case expeditiously.  It stems, too, from the fact that both parties— a mother and father of a five-year-old child—unquestionably care deeply about the fate of their child, but sharply disagree about what proper care requires.

The mother, Petitioner Denise Kalff, wishes to have the child returned to Germany while custody proceedings continue there.  The father, Respondent Samuel Fennell, contends that their child should be left in Hawai‘i, where she is currently located.  Their preferences lie, quite literally, on opposite ends of the earth.  And the question here is which of these extremes must prevail.

To answer that question, the court principally must determine whether Kalff has proved, by a preponderance of the evidence, that the child's habitual residence—that is, her home—was Germany at the time that she was allegedly retained unlawfully here in Hawaiʻi. The court must consider the totality of the circumstances in making this determination. But as the Supreme Court's decision in *Monasky v. Taglieri*, 589 U.S., 68, 77-78 (2020), teaches, the most important consideration is not the preferences or intentions of the parents, but the experiences and acclimatization of the child. That insight, in the end, leads this court to deny the mother's petition.

## PROCEDURAL BACKGROUND

The Convention is implemented domestically by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. §§ 9001 *et seq.*, which vests district courts with jurisdiction over ICARA proceedings. Proceedings of this sort must be conducted on an expedited basis: ICARA provides that a court "shall decide the case in accordance with the Convention," 22 U.S.C. § 9003(d), and Article 2 of the Convention, in turn, instructs courts to "use the most expeditious procedures available" to implement the Convention's objectives. The Ninth Circuit has similarly instructed district courts to use "the most speedy procedures" available. *Holder v. Holder*, 392 F.3d 1009, 1023 (9th Cir. 2004). This speed, while necessary, creates case-management challenges not typically present in ordinary civil litigation.

### A.    Pretrial Proceedings

Kalff filed her Petition for Return on March 4, 2026, Dkt. No. 1, in which she contends that Fennell wrongfully retained their child, LKKF, in Hawai'i in violation of her rights of custody under German law, and that LKKF's habitual residence at the time of the alleged retention was Germany.  On these grounds, Kalff seeks an order directing LKKF's return to Germany.  Fennell disputes that any wrongful retention occurred, contests that LKKF's habitual residence was Germany, and contends that LKKF's home is Hawai'i. and she moved to expedite the proceedings on March 6, 2026.  Dkt. No. 16

Invoking the treaty's mandates, Kalff moved to expedite the proceedings.  Dkt. No. 16.  The court held an initial status conference on March 9, 2026.  On March 14, 2026, at Kalff's request, the court entered an unopposed order directing the parties to submit LKKF's travel documents to the court for safekeeping pending resolution of the petition.  Fennell filed his Answer on March 18, 2026.  Dkt. No. 44.  The court conducted a one-day bench trial on April 3, 2026.  Dkt. No. 76.  Closing arguments were continued and held on April 7, 2026.  Dkt. No. 77.

Given the expedited nature of ICARA proceedings, the court determined that it need not strictly comply with the Federal Rules of Civil Procedure or the Federal Rules of Evidence.  Instead, the court used procedures best suited to achieve a fair, expeditious, and just outcome, as authorized by Rule 1 of the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 1 (admonishing courts and parties to construe,

3

administer, and employ the rules of procedure "to secure the just, speedy, and inexpensive determination of every action and proceeding"); *see also Farr v. Kendrick*, No. CV-19-08127-PCT-DWL, 2019 WL 2568843, at *1 (D. Ariz. June 21, 2019), *aff'd*, 824 F. App'x 480 (9th Cir. 2020).  For example, Kalff wished to present expert testimony.  The default rule under Federal Rule of Civil Procedure 26(a)(2)(D) is that expert disclosures must be made at least 90 days before trial.  But that timeline is not possible to meet in an expedited ICARA proceeding, where the court is instructed to use the "most speedy procedures known."  *Holder*, 392 F. 3d at 1023.  Accordingly, the court did not require Kalff to comply strictly with Rule 26.  The court, moreover, allowed Kalff to present the expert testimony of Dr. Andreas Hanke—an expert on German family law—without making a threshold determination as to whether his opinions satisfied the admissibility standards of Federal Rules of Evidence 702 through 704.  The court also allowed for remote testimony:  consistent with Federal Rule of Civil Procedure 43(a), which permits testimony by contemporaneous transmission from a different location "for good cause in compelling circumstances and with appropriate safeguards," the court allowed certain witnesses located outside Honolulu to testify remotely.  Kalff's expert witness, Dr. Hanke, testified by video teleconference from Germany.  Fennell's Hawai'i State Court attorney, Samuel August, and Fennell's grandmother, Shareen Crowten, testified by videoconference from Maui.  The court found good cause for this accommodation given the expedited schedule and the witnesses' locations.

Furthermore, Article 30 of the Convention provides that any application submitted in accordance with the Convention, together with documents and information appended thereto, "shall be admissible in the courts or administrative authorities of the Contracting States." Hague Conference on Private Int'l Law, 19 I.L.M. 1501, 1504 (1980). Congress implemented Article 30 through 22 U.S.C. § 9005, which provides that no authentication of any ICARA petition, application, or accompanying documents "shall be required in order for the application, petition, document, or information to be admissible in court." 22 U.S.C. § 9005. The court entertained no authentication objections to the documents Kalff offered as evidence that fell within the terms of this statute. *Accord Nowlan v. Nowlan*, 543 F. Supp. 3d 324, 356 (W.D. Va. 2021), *aff'd*, No. 21-1965, 2022 WL 34141 (4th Cir. Jan. 4, 2022); *Gomez v. Gonzalez*, 771 F. Supp. 3d 1150, 1162 n.1 (W.D. Wash. 2025). Beyond authentication, the court did apply the Federal Rules of Evidence in its consideration of Kalff's objections. For example, Fennell offered documents written in German and translated into English through machine translations; because they lacked certified translations, the court declined to admit them. *See Maslic v. ISM Vuzem d.o.o.*, Case No. 21-Civ-02556, 2024 WL 3408217, at *7 (N.D. Cal. July 11, 2024) ("Translations done using Google Translate are not admissible in federal court; translations generally must be performed by a certified interpreter."). And Fennell offered photographs of LKKF in Hawai'i during the time period postdating the alleged unlawful retention (Exhibit D-1); accepting Kalff's

5

relevance objection, the court declined to admit them fully, but instead admitted them only for limited purposes.[1]

## B.    Trial Proceedings

A one-day bench trial was conducted on April 3, 2026.  Dkt. No. 76.  Closing arguments followed on April 7, 2026.  Dkt. No. 77.  During trial, the court heard testimony from the following witnesses:  Kalff; Fennell; Dr. Andreas Hanke,[2] who testified as an expert in German family law on behalf of Kalff; Samuel August, Fennell's Hawaiʻi State Court attorney; and Shareen Crowton, LKKF's paternal grandmother.

In recognition of the need to consider the totality of the circumstances in making a finding of habitual residence, the court admitted nearly all proposed exhibits at trial. But the court reserved judgment on whether to admit a limited set of Kalff's documents. These were documents to which Fennell raised hearsay objections, and for which Kalff did not establish at trial any basis for finding an exclusion from the hearsay definition

---

[1]    Specifically, the court allowed Fennell to offer these photographs solely to advance his argument that they accurately captured how well acclimatized LKKF was in Hawaiʻi even in the period predating the alleged wrongful retention.  In the end, the court has not given these photographs any weight because they did not meaningfully advance that limited permitted objective.

[2]    Dr. Andreas Hanke was admitted as an expert in that subject without objection, and his testimony is credited on matters within that area of expertise.  On cross-examination, Dr. Hanke acknowledged that his opinions regarding rights of custody were grounded in German law, and the court accepted his testimony on that basis.  The court notes limitations on the weight to be accorded certain aspects of Dr. Hanke's opinions where they depended on contested factual predicates.

6

of an exception to the hearsay rule.  Having more carefully considered the matter since trial, and recognizing that this ruling is being made on an expedited basis and with more limited briefing and time than would be required to reach a more confident conclusion (and further recognizing that this ruling is in some tension with the court's having sustained several of Kalff's objections based on an application of the Federal Rules of Evidence, as noted above), the court now admits each of Kalff's proposed exhibits and overrules each of Fennell's hearsay objections.  In other words, the court agrees with the arguments Kalff made in her motion *in limine* before trial, and concludes that in an ICARA proceeding, the strictures of the hearsay rules (for example, the requirements of laying a basis for a business records exception) need not be rigidly followed.

As a consequence, in making the Findings of Fact and Conclusions of Law that follow, the court has considered each of Kalff's proposed exhibits as well as all of the testimony offered on her behalf at trial, and has given each the evidentiary weight that, in the court's judgment, is warranted on this record.

### FINDINGS OF FACT

Based on the admitted exhibits and testimony, the court makes the following Findings of Fact:[3]

---

[3]     Given the expedited proceedings, the court is filing these Findings of Fact before trial transcripts have become available.  For that reason, the court refers to the names of

**A.    The Parties and the Child**

Kalff and Fennell are the parents of the minor child, LKKF.  They have never been married to each other.  Kalff is currently 28 years old, and Fennell is 30.

LKKF is five years old.  She was born on October 2020 in Hawaiʻi, where she is currently physically located.  She holds dual citizenship in Germany and the United States.

Kalff is also a dual citizen of Germany and the United States.  She was born in Germany and has always been a German citizen.  She has not always been a United States citizen; she was a Legal Permanent Resident of the United States until 2024, at which point she naturalized.  Kalff holds German and American passports, as well as a Hawaiʻi driver's license.

Kalff has not consistently lived in any single place.  As she testified, she spent much of her childhood traveling back and forth between Hawaiʻi and Germany, the former because her mother's ex-husband lived in Hawaiʻi.  As Kalff further testified, her schooling in the United States was not her choice, but rather was borne from her mother's travels.  Kalff attended Maui schools on and off during her middle and high

witnesses on whose testimony its findings depend where appropriate, but it does not cite a transcript when describing the testimony.  For ease of exposition, the court provides its factual findings in the text of the order, with explanations of the court's resolution of material factual disputes in accompanying footnotes.

school grades. She attended the Haleakalā Waldorf School, and eventually graduated from King Kekaulike High School on Maui in 2015.

Fennell is a United States citizen. He was born and raised in Hawaiʻi—specifically, on the island of Maui. And he graduated from King Kekaulike High School on Maui in 2014. Fennell's extended family are based in Hawaiʻi. Although Fennell has spent time in Germany, and was once authorized to work there, he has no independent ties to Germany and does not speak German.

Kalff and Fennell both testified at trial. The court carefully observed their demeanor and listened to the substance of their testimony. The court also considered how their testimony squared with the other evidence in the record. From these observations, the court finds that neither was categorically more or less credible than the other, and neither was fully credible. Generally speaking, their testimony was most credible when they explained their own understandings and motivations, and least credible when testifying about the understandings and motivations of the other. But their testimony was, generally, distorted by their unquestionable concern for LKKF and their desire to prevail in this lawsuit—and this extended, at times, even to their testimony about their own beliefs and motives. Their extreme interest in the outcome of this lawsuit caused their testimony to become exaggerated in some ways, and less than forthcoming in others.

To be clear, the court does not find that either witness intentionally offered any false testimony; it was evident that each has come to be convinced of the truth of the narratives they offered.  The court's finding is, instead, that neither narrative is wholly accurate.  Accordingly, in making its Findings of Fact, the court relies on portions of these witnesses' testimony only in those places where the court found it credible—for example, where the witness's demeanor and strength of recollection warrants that finding, or where the testimony was corroborated by other reliable evidence, generally consistent with the totality of the circumstances or common sense, or not contradicted or disputed by the other.

### B.    The Parties' Relationship Prior to and Immediately After Child's Birth

Kalff and Fennell met during high school on Maui and began a romantic relationship in 2014.  During the early period of their relationship, they traveled extensively within the United States, including to Utah and California.  As each of them testified, it was their intention to find a place to live together long term.

In or around November 2018, the parties decided to relocate together to Prien am Chiemsee, Germany ("Prien," for short), approximately one hour south of Munich, which is where Kalff's extended family lives.  As Kalff testified, they resolved their belongings on Maui, packed their suitcases, and moved into a home in Prien rented by Kalff's extended family.  Fennell worked in Prien as a carpenter in an apprenticeship that Kalff's mother helped him obtain.  Kalff desired to pursue higher education in

Germany, but her diploma from an American high school was insufficient for acceptance to the program of her choice at that time.

During this period, Kalff and Fennell did not share an understanding of whether they would reside in Germany long term. Kalff believed Germany would be a suitable place to settle, and hoped to do so. Although Fennell was open to that possibility, he did not definitively come to view Germany that same way. To facilitate the possibility that they could live in Germany long term, however, Fennell obtained an immigration status that would allow him not merely to live in Germany, but to work there as well.[4]

In the end, the parties were in Germany together for less than a year before Fennell left in May 2019. Fennell decided to return to Hawaiʻi after receiving news that a family member had suffered a serious health condition.[5] Fennell did not return to Germany after that departure.

---

[4]    The parties' testimony on this point diverged at trial. Kalff testified that Fennell told her he wanted to find a "forever home" for them in Germany, and that they had both committed to building a life there. Fennell, by contrast, testified that he moved to Germany merely to make Kalff happy and that he viewed the move as purely temporary. The court does not fully credit either account: Kalff's testimony overstates the strength of Fennell's commitment to living in Germany at that time, while Fennell's testimony understates it.

[5]    Kalff testified it was Fennell's grandfather; Fennell testified it was his father, whom he left Germany to say goodbye to. The court credits Fennell's testimony on this point, though it also finds that Kalff testified honestly about her recollection and simply (and understandably) did not recall the details as well as Fennell.

11

In late 2019, Kalff traveled to Hawaiʻi to spend time with Fennell and continue their relationship.  While in Hawaiʻi, Kalff learned she was pregnant in December 2019.  She wanted her baby to be born in Germany, surrounded by her family, and Fennell agreed, but an OB/GYN advised her not to travel during the first trimester of her pregnancy.  But by March 2020, the end of her first trimester, the COVID-19 pandemic made international travel impracticable and unsafe, so they remained in Hawaiʻi for the duration of Kalff's pregnancy.[6]

During Kalff's pregnancy and the months that followed, Kalff and Fennell lived on Maui, initially in a separate unit on Fennell's mother's property, and then in their own home.  LKKF was born in Hawaiʻi in October 2020.  When she was born, Kalff and Fennell voluntarily established paternity by filing a form with the Hawaiʻi Department of Health.  For several months following LKKF's birth, Kalff and Fennell lived together on Maui.

**C.    Travel to Sardinia; End of the Romantic Relationship**

In March 2021, Kalff and Fennell traveled with LKKF to Germany—then approximately six months old—to submit a declaration to the Rosenheim District Office, Youth Welfare Office, establishing joint parental custody of LKKF under

---

[6]    At trial, Fennell's counsel challenged, through cross-examination and argument, Kalff's stated intention to return to Germany for the birth of her child.  Having evaluated Kalff's demeanor during her testimony, and after considering the evidentiary record as a whole, the court credits Kalff's testimony that her baby was born in Hawaiʻi due to the pandemic, rather than any desire on her part to give birth in Hawaiʻi.

German law.  Exhibit P-39.  The declaration was necessary because the parties were not married at the time of LKKF's birth, and submitting that declaration established the parties' joint parental custody rights.  In the time that followed, the parties continued to maintain their registered address in Prien and registered LKKF at the same address with the local registration office in Germany.

Following that registration, Kalff, Fennell, and LKKF traveled to Sardinia, Italy, where Kalff's family maintained a vacation property.  As she testified, Kalff's intention was to bring LKKF to Germany to settle down in Prien near her family, but that COVID-19-related concerns led them to go to Sardinia instead, where conditions felt safer and pandemic restrictions were not as strict as they were in Germany.[7]  Sardinia was the location of Kalff's family's vacation home, and neither party has roots there independently.  They were there, in short, because of its proximity to Germany.

But the parties' emotional—and, eventually, physical—proximity to each other ended while they were in Sardinia.  In around May 2021, Kalff came to believe that Fennell had become sexually involved with one of her sisters and two of her friends.

---

[7]    In his testimony, Fennell portrayed the travel to Germany and Sardinia as much more transitory, as reflecting an attempt to allow Kalff's family an opportunity to spend time with LKKF, rather than as an attempt to settle in or near Germany more permanently.  Having evaluated the parties' demeanor during their testimony, and considered the evidentiary record as a whole, the court credits Kalff's testimony that she made this move to Sardinia with the idea that it might be possible to settle more permanently in Germany once COVID-19 conditions allowed for it.  The court also credits Fennell's testimony to the extent that it reflected, at least in his mind, he was much more equivocal about whether settling in Germany would work out.

From this point on, Kalff no longer had any interest in continuing a romantic relationship with Fennell. Under these tense circumstances, and with their romantic relationship at an end, Fennell moved out of their shared residence in Sardinia.[8]

At the time of their breakup, Fennell had been employed at a restaurant in Sardinia, a job that Kalff's mother helped him obtain, and after he moved out of the shared residence, he moved in with a friend from work—into what he described in his testimony as "workers' housing." At some point after moving out of the shared residence, Fennell made plans to return home to Maui.

### D.      The 2021 Rosenheim Family Court Proceeding and Power of Attorney

While the parties were still in Italy, and before Fennell departed for Hawaiʻi, they filled out an application, admitted as Exhibit P-40, with the Rosenheim Family

---

[8]      During cross-examination, Fennell denied having a sexual encounter with Kalff's sister in 2021 (though he admitted to having one more recently, and did not distinctly deny having had sexual encounters with two of her friends). More fundamentally, Fennell denied that he moved out of the shared residence with Kalff because of any sexual encounters he might have had with other people. But when asked why, in his view, he and Kalff stopped living together despite sharing a then-one-year-old child, Fennell testified, in substance, that he could not remember. Having observed Fennell's demeanor, and in view of the evidentiary record as a whole, the court finds that Fennell was not fully forthcoming on these issues, and therefore does not credit his testimony here.

At the same time, because Kalff did not testify about *how* she knew Fennell had had sexual encounters with other people in around May 2021—and no other reliable evidence was offered to prove he did—the court does not find that Fennell in fact had these encounters. The court finds only that Kalff believed he did, and that this belief was the reason for the definitive breakdown of their relationship. The court further finds that Fennell's testimony that he and Kalff intended to continue trying to work out their relationship after this rupture was not credible.

14

Court in Germany, which would grant Kalff sole custody over LKKF and relinquish

Fennell's custody rights.  The parties traveled from Sardinia to Germany to attend a

proceeding on that petition before the Rosenheim Family Court.

The proceeding at the Rosenheim Family Court occurred on September 20, 2021.

Both Kalff and Fennell appeared, alongside LKKF, who was then approximately eleven

months old.  They did not have legal counsel, but an interpreter was present and a

judge explained the proceeding.  At the time of the proceeding, Kalff, Fennell, and

LKKF, were all registered as residing in Germany at the shared address of Kalff's

mother's home in Prien.  They were not actually living in that home at the time, as they

had been in Germany only briefly in March 2021 before spending the next few months

in Sardinia.  But the shared address proved to be an impediment to Fennell's

application seeking transfer custody to Kalff:  the German court was unable to grant a

formal transfer of sole custody at that time because both parents were registered at the

same home address.[9]  As an alternative, the court offered the parties a power of

---

[9]      Here, again, the parties' testimony diverged.  Kalff testified that Fennell was in
good spirits, that he fully understood the application to grant Kalff sole custody and
agreed to what he was signing, and that he wished to give her full and permanent
authority to make all decisions for LKKF.  Fennell, in sharp contrast, testified that he
did not fully understand what he was signing.  He further testified that he believed the
document merely authorized Kalff to travel with LKKF and to make medical and
caregiving decisions in his absence, and that it was not a document conferring broad
custodial authority or diminishing or extinguishing his own custody rights.  And he
testified that at the court hearing, even with an interpreter present, he did not fully
understand the proceeding.  Having evaluated the parties' demeanor and considered

attorney (the "2021 POA") form, a lesser alternative that would allow Fennell to

delegate decision-marking to Kalff while allowing him to reclaim that delegation

without the need for a court order.

Following the Rosenheim proceeding, on October 9, 2021, Fennell executed the

2021 POA, a document admitted without objection as Exhibit P-41.  The document is in

German, was not notarized, and neither party had independent legal counsel at the time

of signing.[10]  The 2021 POA transfers to Kalff all decision-making authority relating to

---

the evidentiary record as a whole, the court concludes that Kalff's testimony is more
credible on these issues.

Fennell's decision to sign the document conferring sole custody on Kalff is
consistent with the complete breakdown of their relationship after Kalff came to believe
that he had had sexual encounters with others.  It is consistent, too, with the fact that
after that breakdown, Fennell stopped living with Kalff and his daughter and moved
into different housing with a friend.  And it is consistent with the fact that Fennell then
left Sardinia for Maui, and that—as will be discussed below—he and Kalff never lived
together in a shared residence ever again.  Fennell's testimony, by contrast, is not
credible given the procedural protections—including the assistance of an interpreter—
that were provided to him in connection with the German court proceedings.  On a
topic so consequential, and given the obvious intelligence that Fennell displayed during
his testimony at trial, it is simply not credible that he would have signed a document of
this gravity without ensuring that he fully understood it (or asking clarifying questions
of a German court that demonstrated its clear willingness to answer them).  Nor does
the evidence support the suggestion that Kalff in any way misled him about the nature
of the document (which, if true, should have alarmed him once he learned of its true
nature in German court—and yet the record shows he was not alarmed at all).

[10]    The parties provided incompatible testimony on the circumstances surrounding
the signing of the 2021 POA.  For one thing, Fennell recalled signing the 2021 POA at
the German court that very day, whereas Kalff recalled that he signed it sometime later.
For another, Fennell testified that, like the application to transfer sole custody to Kalff,
he did not fully understand the 2021 POA when he signed it, and he believed it would

LKKF for: (i) all matters; (ii) health care; (iii) determination of place of residence; (iv) regulation of contact; (v) dealings with authorities, including matters of assistance with upbringing; (vi) matters of property and assets; (vii) school matters; (viii) representation vis-à-vis the daycare center; (ix) decision on closed placement; and (x) other—next to which the parties filled in the word "Everything" in English.

The 2021 POA authorized Kalff to make all enumerated decisions concerning LKKF. But it did not transfer the underlying custodial rights—which, under German law, remain vested in both parents jointly. Rather, it delegated to Kalff the authority to act as sole custodian in exercising those rights; in a sense, it gave Kalff the authority to act as an agent in exercising the joint custody rights that Fennell possessed as principal but delegated to her.[11] The 2021 POA, in short, operated within the framework of joint custody without extinguishing Fennell's underlying parental rights, which under German law would have to occur through a court order.

---

give Kalff a much narrower form of authority over their daughter. Once again, the court concludes that Fennell's testimony on this topic is not credible, and that Kalff credibly testified about the circumstances of the signing of the 2021 POA, including that Fennell received adequate information from the German court and understood what he was signing. In short, what the record shows is not that Fennell failed to understand the document then, but rather that he regrets having signed it now.

[11]     This characterization is consistent with Kalff's own acknowledgment in her petition to the German Custody Court, admitted as Petitioner's Exhibit P-42, wherein she stated that as of the time of that filing, the parties "currently have joint custody" and that she had received the POA from Fennell.

A few months after signing the 2021 POA, Fennell submitted a separate POA on February 12, 2022, admitted as Exhibit P-48, that evinced his intent to transfer all custodial rights to Kalff (the "2022 POA"). This document, written in English, reiterated the arrangement reached by the parties in the 2021 POA and was meant to allow Kalff to travel freely with LKKF in February 2022, when the record shows Kalff left Europe. Like the 2021 POA, this agreement was not witnessed or notarized. Nonetheless, it operated as a second agreement by which Fennell delegated his decision-making rights to Kalff, this time, under U.S. law.

Fennell did not terminate either the 2021 POA or the 2022 POA at any point prior to Kalff's eventual travels with LKKF in the spring and summer of 2025 (which are further described below).[12]  Throughout the relevant period, therefore, Kalff was

---

[12]    The German Hague Court's findings—which were admitted at this trial as Exhibit P-44—addressed the revocation issue and reached a similar conclusion, namely, that Fennell had not met his burden of proving that the 2021 POA was validly revoked as of October 31, 2025. (Here, the court concludes that Kalff proved that the 2021 POA and 2022 POA were not validly revoked at any time before the alleged wrongful retention).

In a January 2026 proceeding, however, the Hawaiʻi State Court ruled that Fennell has since validly revoked the 2021 POA. Because any revocation postdating the alleged wrongful retention is not relevant to the issues presented here, the court need not—and so does not—resolve whether it agrees with the Hawaiʻi State Court's finding on this issue.

operating under a valid 2021 POA that gave her the legal authority to make decisions about LKKF's residence—including the authority, in principle, to change it.[13]

### E.    Travels Following Fennell's Departure from Europe

For a brief period following Fennell's departure from Europe, Kalff and LKKF remained in Germany. Fennell communicated with LKKF during this period via video calls and phone calls facilitated by Kalff.

Then, from approximately February 2022 through June 2022, Kalff and LKKF traveled to Moʻorea, an island in French Polynesia, for a period of approximately four to five months. Because Moʻorea is a French territory, Kalff and LKKF (who both hold European Union passports) could travel there freely.

### F.    LKKF's Return to Hawaiʻi

From approximately June 2022 onward, Kalff and LKKF returned to Hawaiʻi and resided there for an extended period across multiple islands. Initially, they spent time on Oʻahu, in the home of Kalff's mother. They then relocated to the Island of Hawaiʻi (referred to in testimony as the "Big Island"), which is where Fennell had settled and

---

[13]    That the parties have since found themselves in ongoing custody disputes does not undermine the validity of the 2021 POA or render it inconsistent with Fennell's continued interest in LKKF's life. The record makes plain that Fennell continues to have a strong interest in being a part of his daughter's life. But the issue in this proceeding is a different one, and all that is the relevant here is the validity of the 2021 POA between 2021 and 2025. Kalff proved, on the evidence admitted at this trial, that Fennell did not validly revoke the 2021 POA (or the 2022 POA) at any time in that relevant period.

19

was working.  Although Kalff had no intention of restoring any romantic relationship with Fennell, she wanted Fennell to continue being a part of his daughter's life. Consistent with those intentions, Kalff and Fennell did not share a residence on the Big Island—to the contrary, Kalff and LKKF settled on the opposite side of the Big Island from Fennell—but Kalff made efforts to remain in contact, and as a result, Fennell was able to spend time with LKKF.[14]

Kalff and LKKF then moved again to Maui, resuming residence in Kalff's mother's home, where they remained through approximately June 2024.  Fennell also resided on Maui during portions of this period, though once again—and consistent with the fact that their romantic relationship had ended—he and Kalff did not live together.

Once Kalff and LKKF had re-established themselves on Maui, LKKF began attending the Haleakalā Waldorf School through a scholarship program available to LKKF because she is Native Hawaiian.  Kalff chose the Haleakalā Waldorf School because it was where she herself had attended school, and while her daughter was attending, she volunteered at the school.  Attendance records admitted at trial show that LKKF attended school regularly from October 24, 2023, until February 2025.

---

[14]    Fennell testified that he had arranged housing with the intention that Kalff and LKKF would eventually move in with him.  The court credits Fennell's testimony that those were his hopes and intentions, but to the extent Fennell suggested in his testimony that Kalff shared these goals, the court does not find that suggestion credible on this record.

The evidence presented at trial shows that Kalff and LKKF consistently resided in Hawai'i from June 2022 until February 2025, even though Kalff continued to think of Germany as her home and maintained registrations for herself and LKKF there.  LKKF attended school and activities on Maui, and built relationships with both Kalff's extended family (who reside part-time on Maui) and Fennell's.

During this time, Kalff was enrolled in an online Bachelor's Degree program at Arizona State University in criminology and psychology.  She has since completed a Master's Degree in the same field, and maintains an interest in attending law school in Germany someday.  Fennell, meanwhile, operated a furniture delivery and repair business on Maui for approximately three years.  In 2024, he briefly relocated to Nebraska to explore a business opportunity there.

Kalff and Fennell were on friendly terms and understood themselves to be co-parents to LKKF during this time, even though their romantic relationship had ended back in 2021, and even though Kalff served as the primary custodial parent.  As noted, Kalff's impetus for returning to Hawai'i in 2022 was for LKKF to develop a relationship with Fennell, and by all accounts, she was successful, as LKKF grew closer to her father. Although they did not share a residence, Fennell was allowed visitation with LKKF. LKKF and her father shared meals, did arts and crafts, and spent time outside with

family members.  Kalff and LKKF—who was a toddler at this time—also spent time during various holidays with Fennell and his extended family.[15]

Although LKKF and Kalff spent the majority of their time in Hawai'i, Kalff and LKKF did travel out of state.  From approximately June through August 2024, Kalff and LKKF spent time together in Germany with Kalff's extended family for the summer, and Fennell was aware they were traveling.  But this trip was not intended as a permanent change in residence.  There was no evidence presented at trial (a withdrawal from school, sale of personal effects, or messages, for example) that would suggest the 2024 trip to Germany was meant to be permanent or even indefinite.

And so, following a summer in Germany, Kalff and LKKF returned to Maui, and LKKF resumed attending the Haleakalā Waldorf School.  It was at that school in August 2024 that Kalff met her current partner, Andrew Strand, who was the father of one of

_____

[15]    Photographs admitted as Exhibit D-1 depicted LKKF with family members in Hawai'i in a time period postdating the alleged wrongful retention in December 2025 and showed LKKF appearing comfortable in those surroundings.  As noted above, *see supra* n. 1, the court sustained Kalff's relevance objections and admitted the photographs solely for the limited purpose of allowing Fennell to argue that the photographs accurately captured how well acclimatized LKKF was in Hawai'i even in the period predating the alleged wrongful retention.  As noted, the court has concluded the photographs should not be given any weight because they did not meaningfully advance the limited permitted objective.  In finding that LKKF showed signs of being well acclimatized to Hawai'i in the time period before the alleged wrongful retention, then, the court relies not on the photographs in Exhibit D-1, but on Fennell's testimony and other evidence in the record concerning that relevant time period.

22

LKKF's classmates, ES, and who was separated from his wife and the mother of ES.[16]

By October 2024, Kalff and Strand were in love, and in early 2025, she learned she was

pregnant with Strand's child.

G.    Kalff's Departure from Maui with LKKF

Around February 15, 2025, Kalff pulled LKKF out of school and traveled to Tahiti

for what originally was meant to be a weeklong vacation.  Although LKKF stopped

attending the Haleakalā Waldorf School after February 15, she remained enrolled.

Fennell did not approve of Kalff's decision to travel with LKKF, as the trip

happened without his advance knowledge.  The trip put a strain on Kalff and Fennell's

relationship, and at some point during her trip to Tahiti, Kalff and Fennell had a

significant and emotional falling-out.[17]  Although return flights to Honolulu had been

---

[16]    There is some evidence in the record suggesting that Kalff's relationship with
Strand caused some scandal or controversy in their community on Maui, but the court
concludes that this evidence—consisting largely of out-of-court statements—was not
credible, at least as presented in this trial.  The court therefore does not credit the
suggestion that Kalff's actions following the start of her relationship with Strand were
driven by any interest in avoiding controversy.

[17]    Kalff testified that Fennell told her over a phone call during this period that he
would take LKKF away from her, but based on the court's evaluation of the parties'
demeanor and the evidentiary record as a whole, the court finds that Fennell did not
say anything of that sort explicitly.  As the text above will reflect, however, the court
nonetheless finds that Kalff credibly feared that the relatively complete control over
custody that Fennell had delegated to her through the 2021 POA and the 2022 POA
were now in jeopardy, given the heated dispute over Kalff's Tahiti trip.  The court
further finds that in the face of those fears, Kalff traveled to Germany because she
considers it to be her home.  And the court finds that because she considered Germany
her home, she preferred to litigate custody there.

booked, Kalff unilaterally decided to travel instead to Germany with LKKF in order to resolve custody there. Despite any understanding Kalff and Fennell may have reached about co-parenting during their time together on Maui, Kalff had authority under the 2021 POA to travel with LKKF—and even to establish a new residence for LKKF—without seeking prior approval from Fennell. But because of the sharp breakdown in their relationship, Kalff feared that Fennell might withdraw the authority he had delegated to her in the 2021 POA. A court order granting her more permanent authority was needed, and because she felt more at home in Germany, Kalff preferred to litigate custody there.

## H.  Life in Germany and Custody Proceedings

Sometime around February 23, 2025, Kalff represented to Fennell that they extended the trip to Tahiti, but instead, that week, Kalff traveled with LKKF from Tahiti to Germany. When Fennell learned that Kalff and LKKF had gone to Germany instead of flying from Tahiti back to Hawaiʻi, he went into a panic, repeatedly attempting to contact Kalff and trying to remain in touch with LKKF.

Upon arriving in Germany, Kalff and LKKF moved into the family home in Prien that was rented by Kalff's mother. At this time, Kalff had not firmly committed to live in Germany indefinitely, which is why she had not made any firm plans with Strand about relocating there (despite Strand having another young child with a woman living on Maui). Kalff's intention, instead, was to resolve custody in her favor. To be clear:

24

the court need not, and so does not, find that any of this was done in bad faith. Litigants regularly seek to litigate important matters in courts and in countries with which they are most comfortable. All the court finds here is that when Kalff traveled with LKKF to Germany in early 2025, she had custody—rather than resettling permanently or indefinitely in Germany—in mind.

And so, after she arrived in Germany, Kalff conveyed to Fennell that she wished to "resolve" the custody situation before returning to the United States. On March 10, 2025, Kalff initiated custody proceedings in Germany by filing a petition in the German Custody Court seeking sole parental custody of LKKF. Then, as shown in text messages admitted at trial, Kalff represented to Fennell that she would return to Hawaiʻi with LKKF in the very near future if he signed over his custodial rights to her. She also suggested that her return would be substantially delayed if he did not agree to do so. But Fennell did not agree to sign over custody in the manner Kalff suggested.[18]

---

[18]    In these messages, and consistent with the court's factual findings, Kalff represented to Fennell that she intended to use her Master's Degree (which she completed in the Spring of 2025) in the United States, and that Hawaiʻi, rather than Germany, was her and LKKF's home. Through these statements, Kalff represented to Fennell that LKKF would remain in Hawaiʻi even if Fennell signed away his custody rights.

At trial, however, Kalff testified that she did not truly view Hawaiʻi as her home, that her home was instead Germany, and that she in fact had already made up her mind to raise LKKF indefinitely in Germany. Having observed her demeanor and considered the evidentiary record as a whole, the court does not fully credit Kalff's testimony on these points. Although the court credits Kalff's testimony that she has long viewed Germany as her own home, it finds that Kalff and Fennell both understood that LKKF

25

Kalff and Fennell's communications continued to grow more contentious throughout March and April 2025 as their disagreements about custody deepened. Kalff conveyed that she wanted to seek sole custody of LKKF and she would do so in Germany, allowing her to permanently make unilateral long-term decisions on LKKF's behalf.  Fennell appeared confused by the decision and feared he would lose all rights and contact with his daughter.  He shared his intentions to dispute Kalff's petitions for sole custody.

In the months that followed, Kalff continued to seek sole custody in Germany. On May 4, 2025, Kalff wrote to a German Waldorf school seeking admission to Kindergarten for LKKF.  Exhibit P-29.  Soon after, on May 14, Kalff filed a petition in the German Custody Court seeking an interim injunction prohibiting Fennell, among other things, from entering the residence of Kalff and LKKF, coming within 150 meters of Kalff and LKKF, and contacting LKKF.[19]  The stated reason for Kalff's petition was that

_____

had not yet come to view Germany as her home, and that—at least for the first few months of her return to Germany—Kalff had not yet made any plans to lead LKKF toward viewing Germany as her home.  And the court finds that Kalff's references to raising LKKF in Hawaiʻi in her text messages were not false statements meant to appease Fennell, but instead were a reflection of the parties' shared understanding, at least in that time period.

[19]    Kalff expressed that her actions in the spring and summer of 2025 were due to her fear that Fennell would take LKKF away from her, and that that she was afraid of him.  Kalff's stated fear of Fennell, including her testimony that he had once appeared at her residence with a firearm and had been intoxicated, was not corroborated by any evidence.  No texts, emails, voicemails, or other evidence of threatened violence or

she was fearful of Fennell and worried he would travel to Germany to abduct LKKF.

Exhibit P-43.  The German Custody Court entered an interim injunction order on June

10, 2025.  Fennell was then served with Kalff's sole parental custody petition from

March 2025, the May interim injunction petition, and the German court's June order

granting that petition.

Soon after being served with Kalff's petitions to the German Custody Court,

Fennell began making his own attempts to assert his custody over LKKF, and in a court

of his choosing.  On June 20, 2025, Fennell filed a Petition for Custody, Visitation, and

Support Orders in the Family Court for the Second Circuit in the State of Hawaiʻi.

Exhibit P-47.  But in that petition, Fennell failed to disclose that Kalff had already

petitioned for sole custody in Germany, and that he had, in 2021, signed the 2021 POA

granting her authority to make decisions on his behalf under German law. [20]  Two days

---

specific threatening conduct was introduced at trial.  Nor is there any evidence that—
outside of the specific time period in which Kalff was litigating in German courts and
seeking to secure sole custody over LKKF—she had ever expressed the view that
Fennell was threatening or acting in a manner consistent with that view.  What the
evidence instead shows is that Fennell disagreed with Kalff's unilateral decisions
regarding LKKF's travels in February and March 2025, and that he vigorously
expressed his disagreement.  But the evidence presented at trial did not establish that
Fennell ever engaged in any threatening or violent conduct.

[20]      Kalff contends that Fennell made material misrepresentations to the Hawaiʻi
State Court regarding the existence and effect of the POA and the posture of the
German proceedings that had begun in March 2025.  Fennell disputes this.  The court
admitted to evidence Petitioner's Exhibit P-49, which was Fennell 's December 16
Amended Motion for Pre-Decree Relief to the Hawaiʻi State Court.  It contains a

27

later, on June 22, 2025, Fennell filed an Ex Parte Motion for Emergency Relief, which asserted that LKKF lived in Hawai'i and that Kalff had taken her to Germany without his consent.  Fennell's Ex Parte Motion—unlike his earlier petition—acknowledged that he had received the papers Kalff had filed in the pending German custody case.  The next day, on June 23, 2025, the Hawai'i State Court granted in part Fennell's petition and ordered Kalff to return LKKF to Maui, Hawai'i, or hand over physical custody to Fennell.

Two days later, on June 25, 2025, the German Custody Court held a hearing on Kalff's petition for sole custody, and both Kalff and Fennell appeared with counsel. Although Kalff had not yet been served with Fennell's petition for custody before the Hawai'i State Court, that petition was acknowledged in the German proceeding, demonstrating that Kalff was aware Fennell had petitioned for custody in Hawai'i.[21]

---

statement attributed to Fennell, at Paragraph 6, acknowledging that the parties went to family court together in Germany, that the court drew up a document serving as a power of attorney, that Fennell signed it, and that his understanding was that he still retained his custody rights despite that POA.  Fennell's own account in that filing is consistent with the court's finding that the POA operates within the framework of joint custody rather than extinguishing Fennell's parental rights.  The court declines to make a finding at this time as to whether Fennell's representations to the Hawai'i State Court were materially false.

[21]     Kalff was not personally served with Fennell's petition, however, until December 2, 2025.

28

The German Custody Court suspended the proceedings in Germany pending the final decision of the Hawaiʻi State Court.

Immediately following the hearing before the German Custody Court, Kalff emailed Haleakalā Waldorf School to unenroll LKKF, stating the reason to be "the situation" with LKKF's father, Fennell.[22]  Exhibit D-5.  As of that email, the custody issues remained unresolved, as Kalff sought to remain in Germany and litigate custody there.  But by around this time, Kalff had begun considering the possibility of remaining indefinitely in Germany with LKKF.

Around August 2025, seeking privacy during the final months of her pregnancy, Kalff moved out of her family's home in Prien and into a temporary Airbnb rental apartment seven kilometers away with Strand and LKKF.  Until that point, Strand had been in Hawaiʻi, while Kalff and LKKF had lived with Kalff's mother.  And Strand had not developed any plan for moving indefinitely to Germany (which would have

---

[22]    Kalff testified at trial that she withdrew LKKF from the Haleakala Waldorf School on June 25, 2025, because at that point she understood she was able to remain in Germany with LKKF.  But that understanding was not borne out by the evidence:  at that time, Fennell's Hawaiʻi custody petition was still pending, as were the German Custody Court proceedings, which were stayed pending the Hawaiʻi court's decision.  On this record, as of June 2025, Kalff did not have sufficient assurances that she was able to indefinitely reside in Germany with LKKF.

29

separated him from his child ES on Maui).  But while in Germany together, Kalff and

Strand signed a lease together, which ran from August 21, 2025 to November 30, 2025.[23]

Kalff's relationship with her family had deteriorated around the time of this

move to an Airbnb (though as she testified, Kalff and her family have resumed contact

more recently).  As of the date of the trial, whatever belongings Kalff and LKKF had in

Germany are stored at her mother's home in Prien, as Kalff does not currently hold an

independent address in Germany.  Kalff offered no evidence at trial that Strand would

be welcomed to stay at her mother's Prien home.

As of September 2025, Kalff and LKKF remained in Germany.  Whenever

possible, Fennell tried to stay in contact with LKKF via phone and video call—

facilitated by Kalff—even though communications between Kalff and Fennell were at

times tense and there was an interim order in place barring him from physical contact

with her.

But by September, no further movement had occurred in the Hawai'i custody

case, and the German proceeding remained stayed.  So both Kalff and Fennell took

steps to move their respective custody petitions forward.  On September 4, 2025, Kalff

filed an appeal of the German Court's decision to stay its proceedings, but after learning

that her appeal had not been timely, she decided to withdraw her appeal on September

---

[23]    German regulations limit Airbnb rentals to three months, but the lease also
stated that any extension beyond December 31, 2025, was not possible.  Exhibit P-35.

15. On September 29, relying upon the June 23, 2025, Hawaiʻi State Court order, Fennell filed a Hague Petition for Return in the District Court of Munich in Germany. Fennell's German Hague Petition asserted that LKKF had been unlawfully removed from Hawaiʻi, and that Maui was her habitual residence; it also sought the lifting of the German interim order barring him from having physical contact with LKKF. Fennell asked that the German court grant temporary physical custody of LKKF to Kalff's mother, Andrea, until LKKF could return to Maui.

For the next month, the German Hague Court conducted an assessment on the German Hague Petition, which included an independent home visit with Kalff and LKKF and interviews with Kalff's family. The German Hague Court evaluated the Hawaiʻi State Court proceedings up until that point and appointed a guardian ad litem to represent LKKF. Exhibit P-44.

The German Hague Court held a hearing on Fennell's petition on October 31, 2025. Fennell did not appear for the hearing, but Kalff and LKKF were present. Exhibit P-44, Page 157. Thereafter, the German Hague Court issued a written decision concluding that Fennell had not met his burden of showing that Hawaiʻi was LKKF's habitual residence at the time of the petition's filing, and therefore dismissed the German Hague Petition and denied his request to return LKKF to Hawaiʻi. Exhibit P-44, Page 190. In so finding, the court concluded that "it [could not] be assumed that [LKKF] had a habitual residence exclusively on the island of Maui/Hawaiʻi/USA before

31

entering Germany on or before February 28, 2025." *Id*. Nonetheless, the court concluded that Kalff and Fennell had joint custody based on the agreement they had signed on March 11, 2021. *Id*. At the same time, the court found that Fennell had not revoked the 2021 POA, with the consequence that any rights to travel with LKKF or make decisions as to where LKKF would reside belonged only to Kalff. In the German Hague Court's view, the continuing validity of the 2021 POA and the 2022 POA meant that Kalff continued to have the delegated legal authority to "determine residence" and that she therefore lawfully entered Germany with LKKF in February 2025. *Id*.

Following the denial of Fennell's German Hague Petition, the German Custody Court reasserted jurisdiction over Kalff's petition for sole custody. Fennell created the impression with Kalff that he would be accept these results: he told her that he decided not to appeal the denial of his German Hague Petition and conveyed to her that he would not be moving forward with seeking custody in Hawaiʻi.

He did, however, direct his German attorney to revoke the 2021 POA by communication with Kalff's German attorney.[24] Although there is no evidence in the record that Kalff's German attorney ever received this letter, or that the attorney was a proper recipient of the letter under German law, Fennell nonetheless operated from this

---

[24]    Fennell offered a purported copy of this letter at trial, but as noted, it was in the German language and not accompanied by a certified translation, and the court therefore did not admit it. In finding that Fennell instructed his German attorney to revoke the 2021 POA, the court relies solely on Fennell's testimony, which it finds credible on this point.

32

point forward under the assumption that the 2021 POA was no longer in effect. Kalff, meanwhile, operated from that point forward under the assumption that their custody case would be litigated only in Germany.

Throughout this time, Kalff had been pregnant with her second child, of whom Strand was the father. On October 10, 2025, she gave birth to Baby R. While Kalff was delivering her baby, she arranged for LKKF to stay with their neighbors. Baby R has German citizenship by nature of his birth, although his father, Strand, is an American citizen and does not fluently speak German. Strand does not work in Germany, has no permanent residence in Germany, and, as noted, has not been shown to have any permission to stay at Kalff's mother's home in Prien. While LKKF's primary language is German, she primarily speaks English with Strand. Moreover, as noted, Strand's older child (LKKF's former classmate, ES) resides on Maui with his mother, and the two share custody. In short, although Kalff and Strand are in a long-term relationship, Strand does not intend to reside in Germany long term; he was only in Germany temporarily to support Kalff through her pregnancy and delivery.

LKKF, meanwhile, spent the Summer of 2025 living in her maternal grandmother's home in Prien with her aunts, Kalff's younger sisters. (Because LKKF's grandmother splits her time between Germany and Hawaiʻi, LKKF has spent significant amounts of time with her.) On September 9, 2025, she began attending a Waldorf Kindergarten in Prien, which she attended for just over six weeks until the end of

33

October.  She took dance lessons; traveled in Germany and neighboring Austria with her family; and spent time with neighbors, friends, and pets (including a family member's pet horse, which LKKF has known since she was an infant).  Her mother also looked after her health:  she was registered under the German public health insurance and visited a doctor and a dentist.  And, whenever possible, she stayed in contact with Fennell via phone and video calls.  In total, LKKF resided in Germany from the end of February 2025 until November 4, 2025—just over eight months.

## I.      Departure from Germany

At the end of October, Kalff emailed the school indicating LKKF needed some time off.  Then, on November 4, 2025, Kalff and LKKF traveled from Germany to Minnesota so that Strand's family could meet Baby R, then to Arizona to visit Strand's grandparents, before flying back to Hawaiʻi on November 28.

As noted, at the time that they left Germany, Kalff operated under the assumption that Germany was going to be the only place that her custody case was moving forward.  Although she did not have return flights booked, Kalff intended to fly back to Germany following the Christmas holidays, as the German Custody Court there was set to hear her petition for sole custody on January 5 and 7, 2026.  She planned to enroll in a remote graduate law degree program through a German university, and re-enroll LKKF at the Waldorf school in Prien.

After leaving Germany, Kalff was in contact with Fennell about arranging a time for him to reunite with LKKF once they returned to Hawai'i.  Fennell was looking forward to seeing his daughter again, as he had not spent time with her for over eight months.  But Fennell had other plans, too.  On December 2, 2025, a few days after Kalff and LKKF returned to Maui, Kalff arranged for Fennell and LKKF to spend time together at a park; she joined to supervise the visit.  During that visit, Fennell served Kalff with process in connection with the Hawai'i custody proceedings:  his petition for joint custody, his ex parte motion for emergency relief, and the June 2025 order granting that relief.  After that service, Kalff told Fennell that he would not be able to spend further time with LKKF, given the ongoing proceedings between them in Hawai'i.

Two weeks later, on December 16, Fennell submitted to the Hawai'i State Court an Amended Motion for Pre-Decree Relief, Exhibit P-49, representing that although he had signed the 2021 POA document, he had since sought to revoke it following the German Hague Court's denial of his return petition.  The Hawai'i State Court held an initial hearing on December 18, 2025, in which it entered an interim visitation order, and scheduled an evidentiary hearing for January 7, 2026.  In advance of that hearing, the Hawai'i State Court and German Custody Court communicated to understand where proper jurisdiction belonged.  Exhibit D-12.  The German Custody Court, after communication with the Hawai'i State Court, stayed its proceedings pending the resolution of the evidentiary hearing on jurisdiction.

The hearing was held on January 7, 2026, and included testimony from both Kalff and Fennell, as well as a representative from the Haleakalā Waldorf School. Exhibit D-19. [25] At the conclusion of that hearing, the court ruled that under Chapter 583A of the Hawai'i Revised Statutes, the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA), there was sufficient evidence to show that Hawai'i was LKKF's "home state." Exhibit D-19, at Page 166. The court considered the German Hague Court's ruling but found it to be compatible with its own conclusion, as the German Hague Court had not definitively ruled that Hawai'i was not LKKF's habitual residence, but rather had only found that Fennell failed to prove as much in the German proceeding. *Id*. at Page 167. The court additionally found that Fennell had now validly revoked the 2021 POA, and that as of January 2026, there was no longer any valid POA in place. *Id*. at Page 167. The court denied Fennell's request for an equal time-sharing arrangement given that LKKF had not previously stayed with him for long stretches of time, but ordered an interim visitation schedule, which would allow LKKF to stay with him from 8:30 a.m. on Friday mornings, until 5:00 p.m. on Sunday evenings. *Id*. at Page 180. On January 13, 2026, the Hawai'i State Court entered an order incorporating these findings

---

[25]    Samuel August, Fennell's Hawai'i State Court attorney, testified remotely regarding the January 7, 2026, evidentiary hearing and the Hawai'i State Court's subsequent determination on January 13, 2026, that it had subject-matter jurisdiction. The court admitted this testimony for the limited purpose of establishing the procedural posture of the Hawai'i State Court proceedings. It does not rely on this ruling for any purpose in making these Findings of Fact.

and stating that it has subject-matter jurisdiction over custody proceedings concerning

LKKF, because LKKF was found to be "at home" in Hawai'i within the meaning of the

UCCJEA.

The instant Hague Petition followed. As a consequence of that petition, the

Hawai'i State Court's custody proceedings have been stayed pending the resolution of

this action.

## CONCLUSIONS OF LAW

### A.    Legal Framework

The Hague Convention's overarching goal is "[t]o address the problem of

international child abductions during domestic disputes." *Lozano v. Montoya Alvarez*,

572 U.S. 1, 4 (2014) (cleaned up). The Convention aims to accomplish this goal

primarily through "the prompt return of a child wrongfully removed or retained away

from the country in which she habitually resides." *Monasky*, 589 U.S. at 72. That is

because "the Convention's core premise that 'the interests of children … in matters

relating to their custody' are best served when custody decisions are made in the child's

country of 'habitual residence.'" *In re ICJ*, 13 F.4th 753, 760 (9th Cir. 2021) (quoting

*Monasky*, 589 U.S. at 72). So once the child is returned, it is the courts of the country of

the child's habitual residence that decide the substantive merits of any underlying

custody dispute. *See Redmond v. Redmond*, 724 F.3d 729, 737 (7th Cir. 2013). That is why

ICARA, the Hague Convention's implementing legislation, cautions that, when

evaluating a petition for return, courts "are to determine only rights under the

Convention and not the merits of any underlying child custody claims." 22 U.S.C. §

9001(b)(4).

A Hague Convention petition "typically raise[s] four questions":  (1) When did

the alleged removal or retention of the child occur?  (2) In what country was the child

habitually resident immediately prior to that event?  (3) Was the removal or retention in

breach of the custody rights of the petitioning parent under the law of the child's

habitual residence?  And (4) was the petitioning parent actually exercising those

custody rights at the time?  *Redmond*, 724 F.3d at 737–38 (citing *Karkkainen v. Kovalchuk*,

445 F.3d 280, 287 (3d Cir. 2006)).

Even though a petitioner must answer all four questions to prevail,

"Determination of a child's habitual residence immediately before the alleged wrongful

removal or retention is [] a threshold question in deciding a case under the Hague

Convention."  *Karkkainen*, 445 F.3d at 287; *Monasky*, 589 U.S. at 72.  After all, if the

petitioning parent cannot establish that the child was wrongfully removed from or

retained outside her country of habitual residence, then "there is no 'left-behind' parent

with grounds to complain about the move, and it makes no sense to speak in terms of

ordering the child's 'return.'"  *Redmond*, 724 F.3d at 742.  In that event, "relief under the

Hague Convention must be denied without further inquiry."  *Id.*

The Supreme Court has instructed that a child's habitual residence is determined under a "totality of the circumstances" standard—one that is "fact-driven," "sensitive to the unique circumstances of the case," and "informed by common sense." *Monasky*, 589 U.S. at 77–78. Because the inquiry is so heavily dependent on context, a trial court's resolution of the habitual residence question must be largely driven by factual determinations and factual weighing, rather than legal conventions and mere invocations of prior legal precedent. *Id.* at 78; *see also Nisbet v. Bridger*, 124 F.4th 577, 584 (9th Cir. 2024), cert. denied, 146 S. Ct. 93 (2025) ("A trial court must first correctly identify the totality-of-the-circumstances standard . . . Once it has done so, what remains is a factual question that can be reviewed on appeal only for clear error.").

That is not to say that law and precedent offer no guidance. Courts have converged on a shared understanding: what matters is whether the child has achieved "some degree of integration . . . in a social and family environment." *Monasky*, 589 U.S. at 77. Put more simply, habitual residence is the place where the child is "at home." *Id*. In practical terms, it can be where "the child in fact has been living for an extended period—unless that place was never regarded as more than temporary or there is another place to which the child has a strong attachment." *Id*. at 91–92 (Alito, J., concurring). While *Monasky* cautions courts not to impose "categorical requirements" or reduce the inquiry to a checklist of factors, courts remain obligated by one

39

foundational requirement—that they must assess whether the totality of the evidence shows that the child is truly at home in the claimed country. *See id*. at 80.

For the reasons that follow, the court concludes that on the record presented here, and in light of its Findings of Fact, Kalff has not carried her burden of showing, under the totality of the circumstances, that Germany was LKKF's habitual residence at the time of the alleged wrongful retention on December 2, 2025.

## B.    LKKF Was Not Habitually Resident in Germany on December 2, 2025

The petitioner bears the burden of proving a wrongful removal or retention by a preponderance of the evidence. 22 U.S.C. § 9003(e)(1)(A). To meet that burden, Kalff begins by identifying December 2, 2025—the date on which she learned that Fennell had continued the Hawaiʻi proceedings and was served with papers—as the date of the alleged wrongful retention. The court therefore uses December 2 as the relevant reference point for the habitual residence analysis. Of course, accepting that date for analytical purposes does not require the court to accept Kalff's contention that a wrongful retention in fact occurred. Rather, the court may assess habitual residence "immediately prior to" the alleged retention using the date asserted by the petitioner, without resolving whether the retention was wrongful. *See Monasky*, 589 U.S. at 72.

LKKF, like her mother, has spent much of her life moving between places rather than remaining in one. She has lived in Hawaiʻi, Germany, and elsewhere, in both family homes and more temporary arrangements. That history presents a familiar but

40

often difficult question under the Convention:  when a child has meaningful ties to more than one place, which location constitutes her home, and which reflects only a transitory period of residence?  Kalff's position is that Germany is, and has always been, that home, and that LKKF's time in Hawaiʻi was temporary.  The court's task is to assess whether that characterization is borne out by the evidence of LKKF's life.  As the Supreme Court has explained, a child's residence may be deemed "habitual" only when it is more than transitory—when it reflects something "[c]ustomary, usual, of the nature of a habit." *Id*. at 76.  The inquiry therefore is driven by whether the evidentiary record demonstrates that Germany, rather than Hawaiʻi, functioned as LKKF's home in that sense.

### 1.    Social Relationships and Integration

Kalff's theory of habitual residence places significant weight on her own understanding of where "home" is, and on the premise that LKKF's residence follows from that determination given that Kalff has always served as the primary custodial parent.  It is true that for very young children, courts may in some circumstances look to the primary caregiver's ties in assessing habitual residence.  But LKKF, who was five years old at the time of the alleged retention, is not an infant.  Children of that age are capable of acclimating—they can form their own relationships, develop routines, and come to feel at home in a place. *See Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 272 (3d Cir. 2007) (recognizing that "a four-year-old child is able to acclimate").

41

So rather than placing preeminent weight on Kalff's own sense of home, the court begins its analysis with an inquiry into what the evidence reveals about LKKF herself.

Start with what the record shows about LKKF's life in Germany specifically. From October 2021 through approximately February 2022, Kalff and LKKF were registered in Prien, Germany—but physically present there for only a few months before departing for French Polynesia. From June 2022 through February 2025—nearly three years—they lived primarily in Hawai'i, where LKKF attended school, built relationships, and, by any reasonable measure, grew up. Then, Kalff and LKKF visited Germany in the summer of 2024, for a period roughly coextensive with a typical school vacation, and returned to Hawai'i afterward. There is no evidence that visit was accompanied by any preparations for a permanent change of residence. Then, from the end of February through November 4, 2025—approximately eight months—Kalff and LKKF were in Germany. Kalff argues these eight months were enough, because they were part of a larger pattern by which Kalff and LKKF continuously returned to Germany. They were not.

As the Third Circuit has observed, even a stay of indefinite duration does not establish habitual residence unless it reflects "a sufficient degree of continuity to be properly described as settled." *Tsai-Yi Yang*, 499 F.3d at 273. That is precisely the case here: LKKF's stay in Germany fails to reflect a sufficient degree of continuity. The eight

months in 2025 that LKKF spent in Germany was not a period of settled, stable residence.  Kalff and LKKF initially stayed in Kalff's mother's home in Prien before later moving to a short-term Airbnb rental, where they lived for approximately three months.  This shift in living arrangements reflects a period of transition rather than the kind of settled, stable residence typically associated with habitual residence.  *Accord Douglas v. Douglas*, No. 21-1335, 2021 WL 4286555, at *6 (6th Cir. Sept. 21, 2021) (nothing that a child was not "meaningfully integrated" when moving between temporary housing arrangements).  LKKF attended kindergarten for approximately six weeks before being pulled from school in October 2025.  She took dance lessons.  She re-connected with a family member's pet horse.  And she played with her family dog at her grandmother's house.

To be sure, LKKF acclimated in Germany to a degree.  She has always been fluent in German—it is the primary language she uses to communicate with her mother, even when they are in Hawai'i—and has visited there twice before.  She appears, by all accounts, to have deeply enjoyed her time there.  But acclimatization—measured by the depth and stability of a child's integration into a social environment—is something categorically different from temporary comfort.  *Nisbet*, 124 F.4th at 585–88.  On this record, LKKF's acclimatization in Germany did not approach the level the Convention requires.

43

For one thing, LKKF's relationships—perhaps one of the most important factors pointing to a child's acclimatization—do not anchor her in Germany.  The most significant relationships LKKF had in Germany were with her mother, her maternal grandmother, and her aunts.  But those relationships do not establish Germany as the place where she was "at home."  It is just as likely that she felt comfortable in Germany during this period of transition, *because* she was around the familiar faces of her maternal extended family, given her maternal grandmother splits her time between Germany and Hawai'i.  These were relationships that predated the move to Germany, that exist independently of geography (and indeed, have been most deeply developed while LKKF was in Hawai'i), and that tend to travel with LKKF regardless of where she lives.

Kalff also points out that LKKF has a relationship with Strand and her new baby brother.  But Strand also is not a Germany-based connection, even if LKKF grew more comfortable with him in the few months they lived together there after August 2025. He is an American citizen who does not speak German fluently, who does not work in Germany, who has no permanent place to stay in Germany, and whose older child and co-parent are on Maui with no plan to move elsewhere.  On these facts, Strand's presence in Germany for the last months of Kalff's pregnancy is most plausibly explained by the circumstances of that pregnancy rather than any settled plan to build a life there.  If anything, Strand's presence in Germany cuts against Kalff's position:  it

underscores that even the adult household around LKKF during those eight months was not rooted in Germany.  Nor does the fact that LKKF's baby brother was born in Germany—and holds German citizenship—establish that LKKF herself became habitually resident there.  It does not even establish that that baby brother is likely to grow up in Germany, which—given Strand's ties to Maui—he is not.

Beyond family, LKKF's relationships in Germany during this period were primarily with service providers:  teachers, doctors, and dance instructors who knew her in those limited capacities.  The Ninth Circuit has been direct on this point:  "factors such as physical presence and preschool attendance did not yield any meaningful social connections for a child" are "not entitled to much salience in courts' habitual-residence determinations."  *Nisbet*, 124 F.4th at 585, 588.  Although this court does not rigidly follow that directive, but instead considers afresh whether that is the appropriate way to analyze the individualized circumstances in this unique case, the court concludes that it indeed is.  The record shows that Kalff arranged for LKKF's medical, dental, and therapeutic care while in Germany.  Those facts reflect attentive caregiving during that period.  But they speak to the decisions of a parent providing for her child's needs, not to whether LKKF became integrated into a social and family environment such that Germany became her home.

Ultimately, these facts show that LKKF was present in Germany for a stretch in 2025 and that Kalff cared for her there.  But they do not show that LKKF became

sufficiently integrated into her social environment in Germany to plausibly make Germany her habitual residence. There is a difference—and it is a legally significant one—between a child who has adapted to her surroundings during a temporary stay and a child who has become "firmly rooted" in them. *Karkkainen*, 445 F.3d at 292. The months that LKKF spent in Germany in 2025 did not result in the laying of any firm roots.

### 2.      Kalff's Subjective Intent

The court does not doubt the sincerity of Kalff's belief that Germany is the place she has always considered her home. As Kalff, testified, she always thought of herself as German. After completing high school, she wished to pursue higher education there, but was unable to; when she and Fennell were in a relationship, they explored the idea of settling down there. But believing that Germany is where she belongs is distinct from having established her child there within the meaning of the Convention. As *Monasky* makes clear, parental intent, while relevant, is not dispositive—particularly when the child is old enough to acclimatize independently. 589 U.S. at 78. And in any event, the evidentiary record does not reflect a consistent alignment between Kalff's stated intent and her actual conduct.

Kalff lived with LKKF in Hawaiʻi for nearly three years. She enrolled LKKF in a Hawaiʻi school—one Kalff herself had attended, and at which she volunteered—and spent the majority of her time on Maui. And crucially, she made no preparations to

46

leave Hawai'i permanently until after she had already arrived in Germany in February 2025 and became embroiled in a heated custody dispute with Fennell. Those preparatory actions she did take in early 2025 to facilitate her stay in Germany—selling her car, withdrawing LKKF from school in Hawai'i—do not resolve the question in her favor. Those steps may well reflect Kalff's own intent to leave Hawai'i, though her romantic relationship with Strand, who is bound to Maui by another child, cuts against that reading of the evidence. But it would not be enough even if the record showed that in 2025, Kalff intended to leave Hawai'i; the Convention does not ask whether a parent intended to abandon one place, but rather whether the child became habitually resident in another. On that latter point, as noted above, the record does not show that she did.

Of course, it weighs in Kalff's favor that she and Kalff stayed in Germany (though in changing locations) through the better part of 2025. And because the court has concluded that the 2021 POA and the 2022 POA remained in effect then, it does not accept Fennell's contention that Kalff should not have been allowed to unilaterally take LKKF to Germany in the first place. But several considerations lessen the significance of that time. First, Kalff herself did not intend to stay indefinitely in Germany when she initially moved there; her consideration of the possibility of staying indefinitely arose only after her custody dispute with Fennell became unusually heated. Second, Kalff herself never developed a realistic plan for staying in Germany indefinitely; there was no credible evidence at trial that Strand (who, again, does not speak German fluently,

47

does not work in Germany, and has a separate child with another woman on Maui)

would have accepted any such indefinite stay.  And third, and finally, even accepting

that Kalff consistently regarded Germany as home in her own mind, and viewed

Hawaiʻi as a place she returned to only out of circumstance rather than choice, her

characterization does not tip the analysis toward viewing Germany as LKKF's habitual

residence.  That is because, as explained earlier, the habitual residence inquiry is not

about what a parent wished for; it is what the child actually experienced.  Kalff's

subjective feelings toward a nearly three-year residence in Hawaiʻi, and her hopes that

the more limited time she spent with LKKF in Germany might possibly become more

permanent, are not entitled to controlling weight when determining a child's habitual

residence.  The court accepts that Kalff considers herself a German mother, but a child

does not inherit her mother's habitual residence the way she might inherit her mother's

citizenship.  That is especially so when, as here, the mother's habitual residence is itself

at least somewhat up in the air.

### 3. Formal Ties to Germany

Kalff points to a series of formal indicators reflecting LKKF's ties to Germany.

LKKF has been registered there since 2021, has received a public health insurance card,

and holds German citizenship, and Kalff relies on those facts as evidence of rootedness.

The court is not persuaded.  Formal registration and citizenship are relevant data

points, but they are not dispositive.  Kalff's reliance on registration underscores that

point:  Kalff and LKKF remained registered in Germany throughout the period they were living in Hawai'i.  Indeed, as described earlier, in 2021 Kalff and Fennell remained jointly registered at the Prien address even though their romantic relationship had definitively ended (and even though they were in fact living, in separate quarters, in Sardinia at the time); that registration, which reflected legal status but not reality, was the very reason why Fennell's 2021 application to transfer sole custody to Kalff was not approved by the Rosenheim Family Court.  These formal registrations are relevant, to be sure, but the record in this case amply demonstrates that they do not always faithfully reflect the reality of one's living situation.

In any event, the record reflects comparable formal ties to Hawai'i.  Kalff maintains a Hawai'i driver's license, attended a U.S.-based university, filed taxes in Hawai'i, and, like LKKF, holds citizenship in both countries.  In that sense, the formal indicia point in both directions and therefore would not resolve the inquiry in Germany's favor even if they were given more weight than they deserve.

Kalff also argues that the 2021 POA—which granted her the authority to determine LKKF's place of residence—means her decision to bring LKKF to Germany must be treated as establishing habitual residence there.  The court has indeed found that the 2021 POA was valid and remained unrevoked throughout the relevant period. But the POA is a legal instrument, and habitual residence is a factual question.  *See* *Monasky*, 589, U.S. at 79 ("The Conference deliberately chose 'habitual residence' for its

49

factual character, making it the foundation for the Convention's return remedy in lieu of formal legal concepts like domicile and nationality."). Having the legal authority to change a child's residence is not the same thing as having actually established the child in a new habitual residence. Addressing an analogous argument in *Redmond*, 724 F.3d at 747, the Seventh Circuit held that a parent's lawful authority to relocate did not itself determine habitual residence—that court concluded that a new habitual residence was formed only because, as a matter of fact, the child had actually established an integrated habitual residence through sustained presence in the new country. Here, the facts cut the other way: factual integration did not occur simply because Kalff had the authority to set it in motion, and Kalff did not, in fact, sufficiently use that authority to do so.

### 4.    The Strength of LKKF's Ties Elsewhere

Even when a child has spent meaningful time in a particular place, that place may not not qualify as her habitual residence if "there is another place to which the child has a strong attachment." *Monasky*, 589 U.S. at 91–92 (Alito, J., concurring). While the court need not—and so does not—determine that Hawaiʻi was LKKF's habitual residence at the time of the alleged wrongful retention, the court may query whether there is another place where LKKF's attachments are stronger and more enduring than they are in Germany. And on this record, there is.

LKKF's first five years reflect a notably international and mobile childhood. Born in Hawaiʻi, she spent time in Sardinia as an infant, then lived and traveled across

Germany, French Polynesia, and multiple islands in Hawai'i, later returning again to Germany and traveling through the mainland United States before coming back to Hawai'i. That history reflects a life shaped by movement, exposure, and close family relationships across borders.

Within that broader pattern, Hawai'i stands out as the place where LKKF's life took on the highest degree of continuity. LKKF spent nearly three years in Hawai'i during a formative period, attending school, receiving medical care, interacting with both her mother and father, and building relationships with both parents' extended families. Those relationships were not incidental; they formed the fabric of her life over a sustained period, and they did not disappear when she traveled to Germany. And in contrast, many of the relationships that defined her experience in Germany—particularly with her mother and maternal family, as well as with Strand—are not tied to Germany as a place, but exist across jurisdictions and accompany LKKF wherever she goes, including Hawai'i.

## C.     The Court Declines to Resolve the Remaining Elements

Because it concludes that Kalff has not met her burden of establishing that Germany was LKKF's habitual residency at the time of the alleged wrongful retention, the court must deny her Hague Convention petition. Fennell argues that the petition should be denied for several other reasons, including—in his view—that he did not commit any wrongful retention and did not interfere with Kalff's custodial rights.

51

Fennell's arguments on these issues raise complex questions of both fact and law. For example, he argues that he could not have engaged in wrongful retention merely by making lawful use of state court process. Resolving these additional elements would cause delay in this court's issuance of this order. Given the Hague Convention's mandate that petitions should be resolved expeditiously, the court declines to resolve more than is necessary to decide the petition.

### D.    Compatibility With Prior Decisions

Of course, this court is not the only one to have addressed disputes between Kalff and Fennell. Two other courts have issued decisions that could conceivably be viewed as bearing on the questions presented here. This raises the question of what, if any, comity or faith and credit this court owes to the decisions of those other courts. Granted, if this court's Findings of Fact and Conclusions of Law are compatible with the rulings of those other courts, then there is no need to resolve whether any deference or preclusive value would have been proper in the face of a conflict. And so, while the court has indeed made its Findings of Fact and reached its Conclusions of Law independent of either court, it pauses here to consider whether its findings and conclusions are compatible with both.

1. The German Hague Court issued written findings on October 31, 2025, denying Fennell's German Hague Petition for the return of LKKF to Hawai'i. Exhibit P-44. The German Hague Court found that Fennell had not met his burden of showing

52

that Hawaiʻi was LKKF's habitual residence at the time of the filing, in June 2025; concluded that Kalff had the legal authority to "determine residence"; and found that she "lawfully entered Germany with LKKF." *Id*.  This court's conclusion is compatible with those findings:  like the German Hague Court, this court has found that the 2021 POA and 2022 POA were valid and unrevoked and that Kalff's February 2025 departure with LKKF was lawful.  And while the German Hague Court found that Fennell did not prove Hawaiʻi was LKKF's habitual residence, this court merely finds that Kalff has not proved Germany was.

Were this court inclined to reach different legal conclusion about the validity and effect of the POAs and the requirements for revocation, it would have been compelled to consider whether comity required it to defer to the German Hague Court's legal conclusions.  *See* Hague Convention art. 14.  But the court need not resolve any questions of comity given that it has, in its own independent assessment of the evidence and arguments presented here, reached the same conclusions.

This court's habitual residence determination, by contrast, must be made independently under the Convention and ICARA as interpreted by United States courts.  *Redmond*, 724 F.3d at 741 ("The Hague Convention targets international child abduction; it is not a jurisdiction-allocation or full-faith-and-credit treaty.  It does not provide a remedy for the recognition and enforcement of foreign custody orders or procedures for vindicating a wronged parent's custody rights more generally.").  But

53

that legal principle, too, need not be carefully scrutinized here, for as noted, this court

has reached a habitual residence conclusion that is not inconsistent with that of the

German Hague Court.

2.   On January 13, 2026, the Hawaiʻi State Court entered an order determining

that it has subject-matter jurisdiction over custody proceedings concerning LKKF under

the UCCJEA, finding LKKF to be "at home" in Hawaiʻi.  This court has no occasion to

consider that same issue or to determine whether it would agree or disagree with the

Hawaiʻi State Court.  (Same goes for any other issue that court has resolved).  Nothing

in this court's order touches the merits of the underlying custody dispute or interprets

any provision of the UCCJEA.  The UCCJEA's "home state" concept and the Hague

Convention's "habitual residence" standard are distinct legal frameworks with different

purposes.  *See, e.g.*, *Nowlan*, 543 F. Supp. 3d at 360 (holding that a "home state"

determination has no bearing on a Hague Convention proceeding).

In any event, there is no obvious inconsistency between the Hawaiʻi State Court's

finding that Hawaiʻi is LKKF's "home state" under the UCCJEA today, on the one

hand, and the German Hague Court's decision that Fennell had not, in that proceeding,

proved that Hawaiʻi was her "habitual residence" in June 2025, on the other.   And

there is no inconsistency between either of those rulings and any finding or conclusion

this court has made here.

*       *       *

54

The Hague Convention does not ask which parent loves a child more, or which country better reflects a parent's identity.  A child's life may be enriched by growing up across cultures, languages, and places.  Nothing in this ruling diminishes these truths. The Convention asks a different, more technical question:  where, in fact, was this child living in a settled and integrated way immediately before the child was allegedly wrongfully retained?  That inquiry turns on the child's actual life—her relationships, routines, and lived experience—not on a parent's passport, registration status, or sincerely held view of where home should be.  And on this record, Kalff has not shown that Germany was LKKF's habitual residence.

The Convention reflects a recognition that, without a uniform framework, international custody disputes risk becoming contests over forum, with children moved across borders in search of a more favorable venue.  Its solution is to create a default rule meant to promote stability and the preservation of the status quo:  courts of all signatory countries must return a child to the place of habitual residence and allow the courts of that place to resolve the underlying custody dispute.  This framework does not yield to the preferred outcome of either parent.  Nor does it permit a finding of habitual residence based solely on assertions of national identity, formal registration, or a limited period of transient residence following relocation.  To conclude otherwise would dilute the Convention's protections and undermine the stability it is designed to promote.

Those protections, and that overriding interest in the promotion of stability for a child,

do not allow this court to grant Kalff's petition on the record developed here.

## CONCLUSION

In light of the foregoing Findings of Fact and Conclusions of Law, the court

DENIES Kalff's Petition for Return.

IT IS SO ORDERED.

DATED:  April 17, 2026, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

Civil No. 26-00112 MWJS-KJM; *Kalff v. Fennell*; ORDER DENYING VERIFIED
PETITION FOR RETURN OF CHILD TO GERMANY